This afternoon is in re the Estate of Isringhausen, 410-0811, for the appellant Mr. Massen, for the appellee Mr. Whitman, for the new court, you may proceed. Is that the right pronunciation, Massen? That is correct. Thank you. May it please the court, counsel. As the court indicated, my name is Steve Massen, I'm with Hoagland Fitzgerald Infernitis in Alton, and I am the appellant in this case on behalf of Mary Jane Isringhausen. I know you have read the brief, so you are aware of the fact that this is a will challenge, and this is the first will contest that I've been involved in. And I'm finding that as I get into this case, it's a situation where the lawyers and the judge, the trial judge, know just enough to be dangerous. This is not the typical case. In most cases where there's an anti-nuptial agreement, the issue has to do with full disclosure. And whether the party who is asking for the anti-nuptial agreement has disclosed the full extent of its property. That is not what is at issue here. The things that make this case unique, first of all, are that the anti-nuptial agreement was entered into in 1981. So it predated the Illinois Uniform Premarital Agreement Act, which came into effect in 1990. And as you may be aware, that act requires, finds that anti-nuptial agreements are enforceable unless they are, I can't remember what the term of art is, the legal term, but it sets out the specificity of what's required for enforceability of a prenuptial agreement. For cases that predate 1990, we're reliant on case law. So to that extent, this case is unusual. The second reason that this case is unusual is because it doesn't have to do with full disclosure. There's no dispute that in the 1981 will, there was full disclosure. And you will see as you read through the trial record, time and time again, the attorneys and the judge deal with this case as if it's a typical case. They go back to the fact, well, there was full disclosure here, how could it not be fair? There was full disclosure here, how could it not be enforceable? There was full disclosure here, how could Mary Jane Isringhausen, the wife, not have effectively waived her right to claim against the will? But that's not what the issue is here. Full disclosure in most cases that have to do with antinuptial agreements have to do with the parties sharing information as they come into the marriage. What's taken place in the past, what assets they have. But that doesn't end the question. There also are issues about the promises that are made in that agreement about what is to take place in the future. And that's the issue that we have here. The prenuptial agreement, which is attached to our brief and was entered into in 1981. There's no dispute about the circumstances of the entry of it. At this time, Floyd Isringhausen owned three farms. The farms are set out and the various money that he brought into the marriage is set out in great detail in the prenuptial agreement. There's no dispute about that. Jane Isringhausen was the school librarian at Jerseyville Township School District. She had gotten her degree from Peabody Library School, which is in Nashville. It's now part of Vanderbilt University. She continued teaching until 1985. She had gotten divorced from another teacher who I believe was a football coach in 1978. And she and Floyd got married in 1981. What was the value of the property that she owned at the time of the antenuptial agreement? At the time of the antenuptial agreement, she owned some personal effects, some furniture. She owned a vehicle and she owned a savings account that had a value of about $8,000. Most of her, she did have some tenure as a school teacher and ultimately she did retire in 1985. But there's no dispute that, in fact, the parties don't dispute that there's a great differential in the value of the property that was brought into the antenuptial agreement and into the marriage by the two parties. That's simply not in dispute. There's also no dispute that it was disclosed. But the issue has to do with, and I think we may have misidentified this paragraph from the antenuptial agreement. We got it right in our initial pleading as paragraph 2F, but then later we refer to it as paragraph 4F. And it's actually on page three of the four-page agreement and it has to do with after acquired property after the marriage. And it says, all property acquired by either future husband or future wife or by both of them after solemnization of the marriage, whether real or personal, shall be jointly owned property of the parties as tenants in common, including all rents, issues, profits, and proceeds of the party with each owning a one-half undivided interest therein. Now, the depositions of the administrators of the estate, the depositions of the children have been taken. None of them have any knowledge of the circumstances of the antenuptial agreement. Jane is rehousing. My client's deposition has also been taken. There is no dispute that the prenuptial agreement was prepared by Floyd is rehousing's lawyer, Tom Ryder, that she did not seek separate counsel at that time. She testified in her deposition she knew what his assets were, but she felt she was protected by this paragraph of the antenuptial agreement that anything that they acquired subsequently was to be marital property. And that was her understanding. The marriage continued from 1981 until Floyd became ill in the late 2000s. In May of 2007, he prepared a new will. And the will made reference to this paragraph, and it was referred to as paragraph 4-F of the antenuptial agreement. And in the will, he construed what he meant by that provision. And he said, I give the family automobile, four-wheel pickup, and camper to my wife. It is my position that any livestock or machinery that I own at my death is not affected by the above-referenced antenuptial agreement. While those items were purchased after my marriage to Jane, they were replacements of machinery and livestock that I had before marriage, and not additional property that could be considered property acquired after the marriage as intended by the language in 4-F of the antenuptial agreement, whereby my spouse would own a one-half interest in said items. It is my desire and direction that these items in their entirety pass by the residuary section of my will, and the residuary went to his children. Jane testified in her deposition that she was not aware of this understanding of Floyd until the reading of the will after he had passed. Let me go very briefly, at the time of the reading of the will, the estate was in a different situation than it was when they entered the prenuptial agreement. One of the children, Roger, who actually was the administrator of the estate, ran into some financial difficulties. One of the three farms that was owned by Floyd was sold to assist him in getting out of those difficulties, so he, as part of that transaction, gave over his right to take as one of the beneficiaries of the will. Also, during the last several years of Floyd's life, one of the three farms, one of those farms was taken care of because Roger had to be taken care of. Another farm was given to the children, to the extent permitted by the tax laws, I think 16% per year for several years leading up to Floyd's death. And Jane would sign off on that to maximize the amount that could be conveyed to the children. And it would be the result that at the time that Floyd passed away, there was 14% of the farm that was still owned by Floyd. And then the remaining farm was still owned by them. What took place, there were no significant issues until the reading of the will. And Floyd passed away, Jane was invited to the reading of the will, and the will was read to her. She was then advised, you no longer have to come to any of the meetings of the beneficiaries or the estate, because you are not a beneficiary under the estate. And so she was not included in any subsequent occurrences, any subsequent dealing with the estate. In the interim, after the filing of the will and the entry of the probates, a sale took place, a farm sale, where the children sold all of the equipment and so forth, without consulting with Jane, without conferring with Jane, without doing anything with regard to Jane. Jane did not contact counsel until she saw an advertisement in the local shopper selling the farm that she was living on. And the provisions of the prenuptial agreement provided the following with regard to Jane. First of all, the critical issue was this paragraph 4F, what constituted marital property after they were married. The only other two provisions that were provided with regard to Jane was that she was given a life estate in the home that they lived in, which was located on the farm, and she was made the beneficiary of a $50,000 life insurance policy. Both of those took place in 1981 at the time of the marriage. When Floyd then passed away, the only thing that was left in the joint checking account, and the only thing that Jane was able to claim under paragraph 4F, was a checking account that had about $11,000 in it. The estate and the children said, Jane, you're not part of the will, you don't have to come to these meetings anymore. She being non-litigious, I think us lawyers get so involved in litigation all the time, we forget that most people do not consult with lawyers all the time. Did not consult with a lawyer until she saw the advertisement, she had a life estate in this home in which she was living, and it was advertised in fee simple. The farm was advertised, and that's part of the record here, with two homes, including the home that she was living in. And it's at that time that she contacted me. Initially, we had very little time until a stage of limitations was run. So the first thing I did was file a lease pendants and notice in the recorder's office saying, hey, she's got a life estate, anybody who buys this property is going to be subject to that life estate in that house. And then secondly, we filed two things in the circuit court. One was a claim under paragraph 4F of the antenuptial agreement for the marital assets, and the other was a renunciation of the will, because we really didn't know what we had. And everything has developed since then. We have taken discovery, there's been really no dispute about any of the facts. The facts are the prenuptial agreement is what it is. It was prepared by Floyd's attorney. Jane's understanding was that she was protected by the marital property provision. Her first knowledge of the change in the 2007 will was at the reading of the will. The estate proceeded with handling the estate and the children proceeded with handling the estate under the 2007 will without any regard for including Jane, conferring with Jane about what was meant by paragraph 4F, and she simply had no involvement until she saw the advertisement, my house is being sold. And that's when she contacted counsel. What happened then when we completed depositions is we filed motions for summary judgment. First of all, we asked that the judge grant summary judgment, finding that the will was void and unenforceable, and that she be permitted to take her widow's right against the will, what was remaining of the estate, which is the one-third. And they filed a countervailing motion to find the prenuptial agreement enforceable. Judge Pistorius, after hearing, granted their motion, denied my motion, and that's why we're up on appeal. If you read through his hearing and the comments of the counsel and the comments of the court, you will see that the magic bullet that they refer to every time is, was there for disclosure by Floyd in the anti-nuptial agreement. As if that cures all ills, it does not. We admit he revealed everything he owned. What he did not disclose was what he intended by marital property that they developed after 1981. And that's where the dispute comes. There's where we think that the court made a mistake. The court relied solely on the fact that he had disclosed what his property was. But after that, the court relied too much on the fact that this anti-nuptial agreement is a contract, and too little on the fact that this was a contract between a husband and a wife. And there's where we run into the problems, and there's where we think the judge made an error and should have granted our motion for summary judgment. Keep in mind, this has to do with common law as it existed prior to 1990. First of all, and this is undisputed by the parties, the standard is set out in the Murphy v. Murphy case, and one of the requirements is that the agreement be fair. You asked, what did Jane bring into the estate? She brought $8,000, a vehicle, and some pieces of furniture. What did Floyd bring into the estate? Some farms worth about $2.2 million. Did she know that? She did know that, yes. But she thought she was protected by paragraph 4a. What is that protection? What is the practical meaning of that protection in this set of facts? In this set of facts, we go back to the Murphy v. Murphy case and the cases. First of all, we have several grounds that we think the court made a mistake. First of all, was it fair? No, I'm nuts and bolts. Let's assume for the moment that the anti-nuptial agreement is valid. Let's also assume that this change or interpretation by Floyd as to what he thought it meant is what has disadvantaged your client. What does that mean in terms of dollars? Because the only two things that he mentions are livestock and farm equipment. Sure, but in effect, the only thing she's left with is the $11,000. What that means is this. It means, first of all, you have to look at the prenuptial agreement to determine whether it was fair. That is the standard pre-1990. And if you compare the figures, him having $2.2 million, she coming out of the marriage with a life estate in the house, a $50,000 life insurance policy, and $11,000. Let me try to rephrase the question. We understand that the prenuptial agreement established the ground rules for how things were being done. And the question is after acquired property is supposed to be marital jointly held. Are we talking about trading Bessie or Bossie and the cow and getting a brand new riding lawnmower? Or are we talking about a herd of cattle and two combines? And there's where this is no longer a contracts case. This is a relationship case. Here's what the case law says prior to 1990. The wife is permitted, it is a contract and it can be enforceable, but clearly the relationship between husband and wife is the opposite of an arm's length relationship. So the wife is given certain protections, including in the antenuptial agreement circumstance, and she may make a choice. And that's what we think prevails here. Some things are based on relationships. For example, you may be the most wonderful grandparent a grandson or granddaughter could ever have, but you are not that child's parent. That child's parent has primary claim with regard to that child. The standard is not a level playing field. You're dealt with on different circumstances. I don't understand how that relates to the two questions that you've been asked regarding... Let us assume for the moment that Floyd did not reinterpret or did not add his gloss to what he thought the antenuptial agreement meant. Let's suppose for the moment that she didn't see the notice about the sale and the relatives understood that she had a life estate. The thing that you seem to be complaining about in order to go back and dissolve the antenuptial agreement is this after-acquired property. What we are asking you is what is the value of that after-acquired property viewed in a light most favorable to you? We can't say. I don't know. Did the ad list, if it was a farm sale... The value of the estate was $170,000, something like that, including the livestock. It was in their ballpark. Presumably, if that's all that was involved, then she would have a right as tenant in common to half of that. Some of it, because some of it may have been in existence in 1981. It may have been, but the fact is she was never consulted and never given an opportunity. We're asking a practical question. What is it we're arguing over? Let me tell you what it is we're arguing over. This is not an enforceable antenuptial agreement, because there was not a meeting of the minds. The standard, and there's no dispute about the standard because they've cited it in their brief as well, is set out in Hessek v. Hessek. Supreme Court case 1897. I know it's a long time ago. But it says, after a marriage engagement is entered into, the relationship between the parties is confidential, and the intended wife is supposed to confide in the man to whom she is betrothed to deal fairly and justly with her. Am I out of time? Parties to an antenuptial contract occupy a confidential relation toward each other, while they may lawfully contract with each other where there is full knowledge of all that materially affects the contract, yet where the provision secured for the intended wife is disproportionate to the means of the intended husband, it raises the presumption of designed concealment and throws the burden upon those claiming in his right to prove that there was full knowledge on her part of all that materially affects the contract. All right. I understand that point. Thank you. Counsel? What's your response to that last statement? Your Honor, I was thinking somewhere else, and I'm not sure what the last statement was in its entirety. Primarily it was the duty to deal fairly and equitably with one another because you're in a confidential special relationship. Okay. And that's what I thought it was. The answer to that is very clear. The case law is such that, granted, there's a confidential relationship and there's a presumption that a prenuptial agreement that is entered into as a result of that fiduciary relationship is not enforceable. That's the presumption. Now, how is the presumption rebutted? The presumption is rebutted exactly as the trial court decided. Yet there is complete disclosure or full disclosure, no fraud, no deceit, no coercion. That rebutts that presumption. She has admitted that she knew exactly what he had and what the value of that was. So that presumption was rebutted. She didn't know about the 1987 change to the will, though. So? I mean, the question that I have there is that I don't think that makes any difference. Why would that make any difference? First of all... Well, let me rephrase my question, because this is really the nub of the problem for me. You had the prenuptial agreement. Rights are pretty much frozen in cement at that time. I agree with you. And then Floyd makes a modification to his will, which, on his own volition, throws in a new interpretation of what he thinks should or should not be within the marital estate. And his interpretation, as he wrote in his will, is somewhat contrary to the frozen rights, if you will, under the prenuptial agreement. I don't agree with that. Well, after acquired property. He's saying, if I sell a cow and buy a new cow, it's still the same cow. Well, that's probably not true. We're talking about personal property as opposed to business property. And let me give you another example. Assume that rather than Floyd being a cattle farmer, that he was a grocer on a grocery store. And somebody came in and bought a loaf of bread off the shelf. And he had paid 50 cents for that loaf of bread. But he charged a dollar. And he took 50 cents for that and bought another loaf of bread to put on the shelf. That loaf of bread is still separate property, in my opinion. Well, I understand the concept. And I'm not necessarily disagreeing with the concept. But until we know what we're talking about in terms of, as my prior question was, did he sell one animal and buy another animal with no substantial appreciation in value, or trade in one combine and buy a new combine, which would have a substantial appreciation in value, we don't know what we're talking about. And we would agree that if he had 10 cattle when he got married and he had 50 cattle when he died, we've got property that is marital property and subject to division. If he had $200,000 worth of equipment when he got married and when he died he had $50,000 worth of equipment, we would also agree that there has been appreciation in addition and those things come under that provision. Now, the fact of the matter is, is that at the time that Floyd died, he had retired from actively farming. He still was raising a few head of cattle. He sold $42,000 worth of cattle and $130,000 worth of equipment. In this day and age, that's not very much. And he said $170,000 and that is correct. I wasn't sure at the time, but we looked at that. So in your view, he probably had significantly less personal property when he died than he did when they entered into the agreement. If you're using the word personal property... To mean livestock and farm equipment, primarily. Yes, in the sense of what is business assets or business personal property, yes, he had tremendously less. If he used the profit from the sale of a herd or the sale of cattle to buy $50,000 worth of Microsoft stock, we wouldn't be arguing about that, right? And we wouldn't be arguing about it if he bought $50,000 worth of additional cattle. Well, yes. What we're saying is that in that prenup agreement at the very beginning it lists separate property. And separate property is included as equipment and livestock. That's one of the items. Now, it doesn't make sense to me that you know he's in business and that his cows are not going to live and they're not going to keep cows until they die out on the field. They're going to buy and sell cattle if you're in that business. Also, if a tractor quits running, you're going to buy a tractor to replace it. So what occurred was when you look at that prenup agreement, it is basically could be ambiguous. Now, that's, to me, we got a question of contract interpretation and that the trial judge is going to have to decide whether these cattle are prenup or she gets half of those or she doesn't get half. That is another issue. That's not the prenup itself. First of all, if you read the provision of Floyd's will, it says a little more than what he says. He says I may not be right in this interpretation and if I'm not, then I got a half interest in this big camper and big truck and I'm going to give that to the residue in place of the equipment that I have. But I believe this is what it should be. And that is something that there could be ambiguity in that contract and it could be determined by the court one way or the other. But the problem the court's going to have with that is all this stuff we're talking about is not admissible evidence. What Floyd said in his will and what she's saying she understood that provision to be, there are cases that say you can't do that. A person cannot testify when one is deceased as to what the thoughts and the ideas that were there at the time that this was signed. It has to be determined from the four corners of the document or by parole evidence outside the testimony of the parties. So we have that situation. And what we're based on here, the presumption of nondisclosure, we've overcome that by her own statement that I knew what was there. To overcome this provision, you're going to have to say or they're going to have to decide that Floyd went through this process. I'm going to have my attorney draw this provision up in such a way that if there's an issue we can argue that I get to keep this or my kids get to keep the stock and equipment. He didn't do that. That's not logical to even assume that he did that. What is logical to assume is that when that will was prepared, somebody read that freedom of agreement and said, hey, we may have an issue here and we better address that issue in terms of what you're going to give or not give. Now, there are three criteria to set aside an ending up short agreement. One is that the agreement and the facts of the matter is does not render the person who has the lesser amount penniless. That's in Murphy. It's in several other cases. And what about the case here? When she got married, she had $8,000 vehicle and furniture and furnishings. What's she got now? She's got $60,000. She's got actually another $11,000 from the bank account. She's got $11,000 from a truck she sold. She testified in her deposition and it's in our briefs that Floyd said, I don't want any of your money, that you can do with it what you want to do with it. I'll support you during our marriage. She's got $2,300 a month for the last 26 years. Imagine what that could be if she saved it, which she had every right to and could. She could have a very hefty portfolio. In addition to that, she has a house and according to the terms of the will, everything is paid for. She doesn't pay any rent. She doesn't pay any taxes. She doesn't pay any insurance. She doesn't pay any maintenance. She doesn't pay anything but utilities. Everything else is paid for by the children. In regard to the ad in the paper, that ad was placed by one of the beneficiaries. The estate didn't place that. Again, what he said was correct. It meant nothing really because whoever bought it was going to have to honor that life estate. There's no subtext here of trying to ease Mary Jane out of the picture? Absolutely not. The next thing is, is it fair and reasonable? Getting back to my three criteria, the first one is, is she penniless? The answer is absolutely not. Was she deposed? Yes. Was she asked what she did with the $2,300 a month? She said she has $210,000 in the bank. I'm surprised she didn't have more but that's what it said. Now she has the $60,000 in cash. She has $23,000 a month in pension. I imagine she's getting Social Security from her husband. She's got a residence, a nice home that's absolutely costing nothing to keep up. The second criteria is there's no concealment, deceit, or coercion. Those things didn't occur. The third one is, is it fair and reasonable? The courts say it's fair and reasonable if there's been no concealment. It can be nothing. As a matter of fact, case law says that the marriage itself can be such that she gets nothing as long as everything is disclosed and she makes that agreement and agrees to do that. Our final point, and I'm not sure it was mentioned in passing here by Mr. Masson, but it wasn't what the trial court used to make its decision, and that's acceptance. Case law says that if you accept the benefits of a document, you can't then challenge that document. Now they cite a Nichols case that this court decided that they said, well, the fact that this lady lived in a house in and of itself did not negate that provision or that finding. I think Judge Steigman wrote that opinion, and he said in there, it makes good sense or something to that effect, or this law is sound, but in this particular case as to this particular thing, it's really not fair and conscionable, and we're going to allow them, and I think it was a maintenance issue. But cases generally state that fair and reasonable just means you know what you're doing. That's all it means, and she knew what she was doing. She says she doesn't, but again, anybody can try to negate something and say, I didn't know, who's going to refute that? You have to refute it only by the document itself. The last thing, and I said the other thing was the last thing, but I just thought of something. They're asking that the whole prenup be set aside. I think there's precedent, and I'm specifically referring to the Warren case, which was cited in our brief and cited in their brief. The court, if they feel that this provision is incorrect or whatever, they can deal with that provision itself. They don't have to negate the entire document because of what might have been wrong here, and of course we're saying it's absolutely not wrong. It's simply, hey, this is what I thought. This is what I interpret. If I'm wrong, if I'm interpreting this wrong, then here's an alternative. That's all he did, and getting back to that $170,000, that's the complete residue. Out of that, there are a lot of expenses. I mean, what she's really after in that regard is not a great amount of money in view of setting aside the complete prenup. When she said time and time again, you know, Floyd meant for these farms to go to his kids. I have no problem with that. As a matter of fact, as he said, I helped give an interest in that farm away to those kids, and now she's saying, yes, I want part of that farm. I don't think that she is entitled to it because there is nothing in the law that would allow this prenup to be set aside because that's an opinion you have to look at. And that's a different story. That's for another day. We're talking about that document itself. Thank you. Thank you, counsel. Rebell? Thank you, Your Honor. Mr. Whitman starts with the same argument that was made in the trial court and the same issue that was followed by the trial judge and the attorneys in the trial court. And that is, was there full disclosure? If there's full disclosure at the time of the ending of the nuptial agreement, their opinion is game over. Are you talking about the end of the nuptial agreement should not be enforced? Yes, Your Honor. Exactly. And that's the Hessig case. They admit that there's a prima facie case that we've established. This is argument two in our brief, and I think this is where we have to carry the day. They admit that it is inequitable and it's heavy on the side of the husband. And they admit that then the burden becomes theirs to establish that it's enforceable. But there's where we diverge. They say, he disclosed everything, therefore it's enforceable. That's not what the case law says. If that's what the rule was, then the case law would say it doesn't say, and it doesn't say this, full knowledge of the husband's assets. That's not what it says in Hessig v. Hessig. Here's what it says. Once they have that burden, they have to show it throws the burden upon those claiming in his right, in Floyd's right to affirm the agreement, to prove that there was full knowledge on her part, and it doesn't say of the husband's assets, full knowledge of the husband's assets. Here's what it says. Full knowledge on her part of all that materially affected the contract. She doesn't have it. They can't prove it. The children were deposed. They don't know what happened in that agreement. Well, excuse me, but if you go back to the time where the intellectual agreement was entered into, are you making an argument here that there was not full disclosure at that time? Yes, I am, Your Honor. I am making the claim that their understanding of what was meant by paragraph 4-F, marital property, was different. You see that now? You see you've lost my train here. Okay. In 1981, they sat down. Mr. Isenhausen says, this is what I own. It's a list. She sits down, this is what I have. Right. Okay, obviously weighted substantially differently at the time. So six years pass, he makes a tweak to his will, which may or may not be in violation of the prenuptial agreement. We haven't gotten there yet in terms of our discussion. But at the time the antinuptial agreement was entered into in 1981, there was full disclosure at that time, true or false? There was full disclosure of assets, of what they brought into the marriage, yes. Well, what else needed to be disclosed? All that material affected the contract. And that includes what's meant by marital property. And the change in the will was 26 years later. That happened six years later. 26 years later. 16 years later. 26 years later, 1981 to 2007. Keep in mind that this, you know, one of the problems we have with this case is she couldn't claim custodial rights either because she didn't know, you know, she took care of him and kept him out of the nursing home. She maximized the assets that the children were able to take care of and her repayment was to be closed out. That is not what the law says. The law says, throws the burden upon those claiming in his right to prove that there was full knowledge on her part of all that materially affected the contract. And the only way that you can reach that is to say that paragraph 4-F didn't materially affect the contract. She testified that it did. He clearly indicated that it did in his will. It materially affected the contract. They can't meet their burden. The issue is whether or not paragraph 4-F is void. The issue is... It doesn't have anything to do with the underlying and an actual agreement. The question is whether or not his purported slash attempted modification of it has any effect. Yeah, and here's where I would ask you to look at Hessek v. Hessek because it says they have to show that she had full knowledge of all that materially affected the contract. And she testified she did not. She knew nothing about his understanding of 4-F until the rule was read in 2007. That's their burden to prove if they want that prenuptial agreement to be enforced. Otherwise, she stays the same as every other widow who is given a statutory right of one-third to claim against the will. That's because of the relationship. A partial share of what's left over after $170,000 and all the expenses of the estate are paid. A 50% share of that somehow invalidates an agreement that is premised on the single material fact, Ma'am, you are marrying a farmer, and I'm well-to-do, and this land is going to go to my children, and you're never going to have any claim on it, and farmland carries with it the idea of I have equipment, if I'm a livestock farmer, I have livestock. I don't understand how that single fact, the operative fact is she would get 50% if we said that that was void, the change or the reinterpretation. And I'm not even sure it's a change when the person who's writing it says, I may be wrong, I don't know anything about this stuff, and if I'm wrong, then I want to readjust this other piece of property. See, that's where this is no longer a contracts case, this is a prenuptial agreement case between a husband and a wife. They are in the most confidential relationship. And that most confidential relationship is when you marry me, you better understand that this land and my children come first in regards to that. But in the interim, I will be the best husband I can be, and I will provide and support you, and I don't want you to use a single dime of your money from your hard-earned retirement and your work as a librarian to support this family. I will do that. I mean, if I entered into a relationship with somebody, I think I would understand what that meant. Well, all I can do is say that all the testimony is that she understood that he had farms worth $2.2 million, she understood that she had no claim in that, she understood that she was protected because everything that the parties accumulated after they were married was going to be very popular. What did they accumulate during the marriage? We have no way of knowing. She was never permitted to be part of the probate. That's the problem. How about being part of the marriage? She had no knowledge of any of his dealings. She certainly did, yes. But she knew he was winding down his farming. And she had no problem with that. But she had a problem with them saying that she had no claim to any marital property under paragraph 4F. And that by part of that agreement, she waived her right to claim against the will. What was the value of the farmland that he had an interest in at the time of his death? At the time of his death, I don't know. $1.4 million? I don't know. So there's less than half. I can tell you that the farmland that he had, he had 16% of the cattle farm, and he had 50% of the bottom farm. And the two farms together sold for around $3 million. So if they sold for $3, $3.5 million, and they both bought about The cattle farm was 500 acres. The farm in the bottom was less than that. But they both bought about the same amount. The bottom farm was a good farm. You may conclude. Thank you, Your Honor. Just very briefly. May I rephrase what you just said? Briefly. Okay. If you follow Hessek v. Hessek, the requirement is not that they prove she had full knowledge of the husband's assets. It's that they prove that she had full knowledge of all that materially affects the contract. You cannot say that paragraph 4F did not fully, did not materially affect the contract. It's undisputed. She has no knowledge of that. They cannot meet that. That doesn't mean, all she gets as a result of that is what she would have had had they not entered the agreement, which is the right to claim her one-third widow's share against the will. And this is a relationship case, Your Honors. It's not a contracts case. She was deprived of the right to get involved in communicating or dealing with or construing their contract. They worked under their will. So as a result of that, this is a relationships case. Thank you, Counsel. Thank you, Your Honor.